BROWNE GEORGE ROSS LLP
Guy C. Nicholson (State Bar No. 106133)
  gnicholson@bgrfirm.com
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile:  (310) 275-5697

SHACKELFORD, BOWEN, MCKINLEY & NORTON, LLP
Jay Bowen *(Pro Hac Vice being filed)*
  JBowen@shackelfordlaw.net
John Nefflen *(Pro Hac Vice being filed)*
  JNefflen@shackelfordlaw.net
Will Parsons *(Pro Hac Vice being filed)*
  WParsons@shackelfordlaw.net
47 Music Square East
Nashville, TN  37203
Telephone: (615) 329-4440
Facsimile:  (615) 329-4485

Attorneys for Plaintiff Unidisc Music, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNIDISC MUSIC, INC., a Canadian corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>WILLIAM SHELBY, an individual; KEVIN SPENCER, an individual; LEON SYLVERS, an individual; NIEDRA BEARD a/k/a NIDRA SYLVERS, an individual; and LINDA CARRIERE a/k/a LINDA VAN HORSSEN, an individual; and all professionally known as DYNASTY, a musical group; THREE FOR LOVE, INC., a California corporation; JODY WATLEY, an individual, JEFFREY DANIELS, an individual; HOWARD HEWETT, an individual; and all professionally known as SHALAMAR; OCEANFRONT, INC., a California corporation; FRED ALEXANDER, JR., an individual; NORMAN BEAVERS, an individual; MARVIN CRAIG, an individual; FRED LEWIS, an | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) DECLARATORY JUDGMENT OF COPYRIGHT OWNERSHIP;**<br>**(2) DECLARATORY JUDGMENT;**<br>**(3) COPYRIGHT INFRINGEMENT;**<br>**(4) INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

805185.1

COMPLAINT

individual; TIEMEYER McCAIN, an
individual; STEPHEN SHOCKLEY, an
individual; THOMAS SHELBY, an
individual; OTIS STOKES, an
individual; MARK WOOD, an
individual; and all professionally known
as LAKESIDE, a musical group;
BOBBY LOVELACE, an individual;
WILLIAM SIMMONS, an individual;
BOAZ WATSON, an individual;
MELVIN GENTRY, an individual;
BELINDA LIPSCOMB, an individual;
KENNETH GANT, an individual;
JEFFREY COOPER, an individual;
VINCENT CALLOWAY, an
individual; REGINALD CALLOWAY,
an individual; and all professionally
known as MIDNIGHT STAR, a
musical group; MIDNIGHT STAR
PRODUCTIONS, INC., an Ohio
corporation; LASTRADA
ENTERTAINMENT COMPANY,
LTD., a New York corporation;
LAURENCE S. MOELIS, an
individual; and STEPHEN MOELIS, an
individual,

           Defendants.

1.    This case involves claims of U.S. copyright ownership ("Copyrights")
in the master sound recordings ("Masters") of four (4) musical groups – Dynasty,
Shalamar, Lakeside, and Midnight Star – who recorded the Masters for the Sound of
Los Angeles Records ("SOLAR") record label in the late-1970s and 1980s.

2.    Effective March 1, 2005, Unidisc Music Inc. ("Unidisc") acquired the
Copyrights in certain of SOLAR's Masters, including those of Dynasty, Shalamar,
Lakeside, and Midnight Star.  On or about July 17, 2007, Unidisc recorded its
ownership of these Masters and their Copyrights with the U.S. Copyright Office
(Document No. V3554D830, date of execution as of March 1, 2005).

3.    On November 13, 2013, Lastrada Entertainment Company, Ltd.
("Lastrada") – a music publishing company claiming to be the "duly authorized

agent" of Lakeside – wrote to Unidisc purporting to exercise Lakeside's alleged rights to terminate Unidisc's Copyrights in certain Lakeside Masters.  On December 24, 2013, Lastrada – claiming to be the "duly authorized agent" of Dynasty, Shalamar, and Midnight Star – wrote to Unidisc purporting to terminate Unidisc's Copyrights in certain Dynasty, Shalamar, and Midnight Star Masters.  As authority for the terminations, Lastrada cited 17 U.S.C. § 203, which permits an author to terminate a grant of copyright "in the case of any work other than a work made for hire" within a certain period of time after the date of execution of the grant of rights in or publication of the work.  The termination notices stated that they were effective as of January 1, 2016.

4.     Unidisc advised Lastrada that the terminations were ineffective for a number of reasons.  Most notably, Unidisc advised Lastrada that the Masters constituted "works made for hire" and, therefore, were not subject to copyright termination under 17 U.S.C. § 203.  Unidisc also advised Lastrada that the terminations were ineffective because the notices failed to comply with the statutory requirements.  Notwithstanding these facts, Lastrada has refused to recognize Unidisc's continuing ownership of the Copyrights in the Masters.  It has interfered with Unidisc's exercise of ownership in the Masters, has advised third parties that Unidisc no longer owns the Masters, and has wrongfully held itself out as the sole owner of the Masters.  The parties have been unable to resolve their competing claims of ownership and Unidisc seeks declaratory and other relief from this Court.

## The Parties, Jurisdiction, and Venue

5.     Unidisc is a Canadian corporation with its principal place of business at 57-b Hymus Boulevard, Pointe Claire, Quebec H9R 4T2.  Unidisc is engaged in the business of exploiting, distributing, and marketing sound recordings (and derivatives thereof) and musical compositions throughout the world, including in the United States.

6.      Defendants William Shelby, Kevin Spencer, Leon Sylvers, Niedra Beard a/k/a Nidra Sylvers, and Linda Carriere a/k/a Linda Van Horssen are individuals who are professionally known as the musical group "Dynasty."  They can be served through their "duly authorized agent" Lastrada Entertainment Company, Ltd., 1315B Broadway, Suite 213, Hewlett, New York 11557.

7.      Defendant Three for Love, Inc. is a corporation organized under the laws of the State of California.  According to the California Secretary of State's website, its status is "FTB Suspended."  The Agent for Service of Process listed on the California Secretary of State's website is Robert H. Lieberman, 1875 Century Pk. East, Suite 1450, Los Angeles, CA 90067.

8.      Defendants Jody Watley, Jeffrey Daniels, and Howard Hewett are individuals who are professionally known as the musical group "Shalamar."  They can be served through their "duly authorized agent" Lastrada Entertainment Company, Ltd., 1315B Broadway, Suite 213, Hewlett, New York 11557.

9.      Defendant Oceanfront, Inc. is a corporation organized under the laws of the State of California.  According to the California Secretary of State's website, its status is "FTB Suspended."  The Agent for Service of Process listed on the California Secretary of State's website is Joel R. Strote, 280 S. Beverly Dr., Ste. 402, Beverly Hills, California 90212.

10.     Defendants Fred Alexander, Jr., Norman Beavers, Marvin Craig, Fred Lewis, Tiemeyer McCain, Stephen Shockley, Thomas Shelby, Otis Stokes, and Mark Wood are individuals who are professionally known as the musical group "Lakeside."  They can be served through their "duly authorized agent" Lastrada Entertainment Company, Ltd., 1315B Broadway, Suite 213, Hewlett, New York 11557.

11.     Defendants Bobby Lovelace, William Simmons, Boaz Watson, Melvin Gentry, Belinda Lipscomb, Kenneth Gant, Jeffrey Cooper, Vincent Calloway, and

Reginald Calloway are individuals who are professionally known as the musical group "Midnight Star." They can be served through their "duly authorized agent" Lastrada Entertainment Company, Ltd., 1315B Broadway, Suite 213, Hewlett, New York 11557.

12.    Defendant Midnight Star Productions, Inc. is a corporation organized under the laws of the State of Ohio. Its registered agent is Bobby Lovelace, 3711 Mack Road, A-1, Fairfield, Ohio 45014.

13.    Defendant Lastrada is a corporation organized under the laws of the State of New York and located at 1315B Broadway, Suite 213, Hewlett, New York 11557.

14.    Defendants Laurence S. Moelis and Stephen Moelis (collectively, "Moelis Brothers") are individuals residing in the State of New York. They do business through Lastrada, which is located at 1315B Broadway, Suite 213, Hewlett, New York 11557.

15.    This Court has exclusive subject matter jurisdiction over Unidisc's copyright claims in this action pursuant to 28 U.S.C § 1338(a) because they arise under the copyright laws of the United States, 17 U.S.C. §§ 101, *et seq.* and because, pursuant to 28 U.S.C. § 1332(a)(2), the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000 and is between Unidisc, a citizen of a foreign state, Canada, and citizens of several states of the United States. Moreover, pursuant to 28 U.S.C. § 1367, this Court has subject matter jurisdiction over Unidisc's claim for intentional interference with business relations because this claim arises from the same set of operative facts as Unidisc's copyright claims and is so inextricably interwoven that the claims interrelate and this same set of facts gives rise to all of the claims herein, forming one case or controversy.

16.    This Court has personal jurisdiction over Defendants because Defendants entered into contracts to be performed within the State of California and

1    because this case arises out of those contracts.

2        17.    Venue is proper in this judicial district pursuant to the copyright venue

3    statute, 28 U.S.C. § 1400(a), because Defendants may be found in this district.

4                              **Factual Allegations**

5        18.    SOLAR was established in 1977 by record producer and music

6    promoter Dick Griffey as an outgrowth of the TV variety show "Soul Train."  The

7    label developed a signature "SOLAR sound" of soul and funk-infused disco/dance

8    music.  SOLAR had significant success during the late 1970s and 1980s with acts

9    such as Dynasty, Shalamar, Lakeside, Midnight Star, The Whispers, Klymaxx,

10   Calloway, Carrie Lucas, Collage, and The Deele.

11            **Recording Industry Custom and Practice in the 1970s and 1980s**

12       19.    During the 1970s and 1980s, when the recording agreements at issue in

13   this case were executed, it was the custom and practice in the recording industry that

14   recording agreements (such as those at issue in this case) provided that the recording

15   artist was an employee of the record company.  It was also the custom and practice

16   that such recording agreements described the rights of the record company (the

17   employer) to control the significant aspects of the recording process and that

18   Masters resulting from this recording process constituted works made for hire, as

19   defined in 17 U.S.C. § 101.

20   **I.    Dynasty.**

21       20.    Dynasty is a Los Angeles-based musical group created by Dick Griffey

22   and in-house SOLAR producer Leon Sylvers.  The group formed in the late 1970s.

23   Its original members were Niedra Beard, Linda Carriere, and Kevin Spencer.  In or

24   around 1981, Leon Sylvers and William Shelby joined the group.

25       **A.    The 1979 Dynasty Agreement.**

26       21.    On or about July 10, 1979, Spencer, Beard, and Carriere p/k/a Dynasty

27   entered into a recording agreement with Dick Griffey d/b/a Solar Records (the

28

1    "1979 Dynasty Agreement").

2         22.    Dynasty recorded two (2) albums pursuant to the 1979 Dynasty

3    Agreement: *Your Piece of the Rock* (July 17, 1979); and *Adventures in the Land of*

4    *Music* (June 30, 1980).

5         23.    Unidisc does not possess a copy of the 1979 Dynasty Agreement.

6    Upon information and belief, however, Dynasty and/or its current or former agents

7    possess a copy.

8         **B.    The 1981 Dynasty Agreement.**

9         24.    On May 1, 1981, William Shelby, Kevin Spencer, Leon Sylvers, Niedra

10   Beard, and Linda Carriere p/k/a "Dynasty" entered into a recording agreement with

11   SOLAR (the "1981 Dynasty Agreement").  The 1981 Dynasty Agreement

12   superseded the 1979 Dynasty Agreement.

13        25.    Under the 1981 Dynasty Agreement, Dynasty agreed to record for and

14   deliver to SOLAR Masters embodying the performances of Dynasty.  SOLAR

15   required that the Masters to be delivered be "fully mixed, leadered, sequenced, and

16   equalized 15 i.p.s. two-track master tapes, in proper form for the production of the

17   parts necessary to manufacture phonograph records therefrom."

18        26.    The term of the 1981 Dynasty Agreement consisted of an initial term

19   commencing on the date of this Agreement and continuing for three years (3)

20   thereafter and any extensions of the term as provided in this Agreement.  During the

21   initial term, Dynasty agreed to record for SOLAR, at a minimum, sufficient Masters

22   to constitute four (4) 12-inch, 33-1/3 rpm long-playing records, each of no fewer

23   than thirty-five (35) and of no more than forty (40) minutes in duration (hereinafter

24   sometimes referred to individually by the term "LP" and collectively by the term

25   "LPs").  Dynasty granted SOLAR one (1) option to renew the term of the 1981

26   Dynasty Agreement for a two (2) year term.  During the renewal term, Dynasty

27   agreed to record three (3) LPs.

28

-7-

27.     Under the 1981 Dynasty Agreement, Dynasty agreed that each Master would embody its performance as the sole featured artist of a single musical composition previously unrecorded by Dynasty, and that each Master would be recorded in its entirety at a recording studio or studios.  Dynasty further agreed that each LP recorded under the 1981 Dynasty Agreement would embody no fewer than seven (7) and no more than ten (10) musical compositions.  Dynasty agreed to record all Masters upon such dates and at such locations as designated by SOLAR upon reasonable notice to Dynasty.

28.     While Dynasty was permitted to designate the musical compositions or other selections to be embodied in the Masters (and other aspects of recording), SOLAR retained the right to approve all such designations.  Dynasty agreed that, upon SOLAR's request, it would re-record any musical composition or other selection until a given Master was commercially and technically satisfactory to SOLAR.

29.     So that SOLAR could meet and fully comply with an agreed-upon delivery schedule with its distributor, Dynasty agreed to use its best efforts to assist SOLAR in completing the recording and production of each LP required to be delivered by Dynasty on certain dates set forth in the 1981 Dynasty Agreement. SOLAR reserved the right to change the delivery schedule upon advance notice to Dynasty.

30.     SOLAR agreed to make all minimum union scale payments required to be made to the members of Dynasty in connection with their recording services under the 1981 Dynasty Agreement.  SOLAR also agreed to approve and provide a recording budget of One Hundred Fifty Thousand Dollars ($150,000.00) for each LP required to be recorded during the initial term and One Hundred Seventy-Five Thousand Dollars ($175,000.00) for each LP required to be recorded during the renewal term.

31.     Dynasty agreed that all Masters recorded during the term of the 1981 Dynasty Agreement – and all copyrights in the Masters and all renewals and extensions of those copyrights – would be entirely SOLAR's property, free of any claims whatsoever by Dynasty or any other person, firm, or corporation.  Dynasty agreed that SOLAR would have the sole and exclusive right to copyright the Masters in its name, as the owner and author of the Masters, and to secure any and all renewals and extensions of such copyrights.  Dynasty agreed that, in rendering services in connection with the Masters, its members were SOLAR's employees for hire.  Dynasty agreed that, upon SOLAR's request, it would execute and deliver to SOLAR assignments of copyright (including renewals and extensions of thereof) in and to the Masters as SOLAR might deem necessary.  Dynasty irrevocably appointed SOLAR its attorney-in-fact for the purpose of executing such assignments in Dynasty's name.

32.     The 1981 Dynasty Agreement was exclusive, meaning that Dynasty agreed to record exclusively for SOLAR during the term of this Agreement. Dynasty agreed, upon SOLAR's request, to appear on dates and at film studios or other locations designated by SOLAR upon reasonable notice to Dynasty for the filming, taping, or other permanent fixation of audio-visual reproductions of Dynasty's performances.  SOLAR had the right to assign any of its rights, in whole or in part, under the 1981 Dynasty Agreement.

33.     Dynasty recorded three (3) albums pursuant to the 1981 Dynasty Agreement: *The Second Adventure* (August 28, 1981); *Right Back at Cha!* (October 22, 1982); and *Out of Control* (March 30, 1988).

**II.     Shalamar.**

34.     Shalamar is a disco, funk, and soul music vocal group created by Dick Griffey and "Soul Train" creator and producer Don Cornelius.  The group formed in the mid-1970s and performed throughout the 1980s.  Its original members were

1  Jody Watley, Jeffrey Daniels, and Gary Mumford.  Subsequently, Gerald Brown

2  replaced Gary Mumford.  In or around 1979, Howard Hewett replaced Brown

3       **A.**     **The 1979 Shalamar Agreement.**

4       35.     On or about February 5, 1979, Watley, Daniels, and Hewett p/k/a

5  Shalamar entered into a recording agreement with Solar Records (the "1979

6  Shalamar Agreement").

7       36.     Shalamar recorded three (3) albums pursuant to the 1979 Shalamar

8  Agreement: *Disco Gardens* (August 16, 1978); *Big Fun* (August 21, 1979); and

9  *Three For Love* (December 15, 1980).

10       37.     Unidisc does not possess a copy of the 1979 Shalamar Agreement.

11  Upon information and belief, however, Shalamar and/or its current or former agents

12  possess a copy.

13       **B.**     **The 1981 Shalamar Agreement.**

14       38.     On August 15, 1981, Three For Love, Inc. entered into an agreement

15  with SOLAR with respect to the production of Masters of the recording artists

16  professionally known as "Shalamar" (the "1981 Shalamar Agreement").  The 1981

17  Shalamar Agreement superseded the 1979 Shalamar Agreement.

18       39.     Attached to the 1981 Shalamar Agreement is an "inducement letter"

19  addressed to SOLAR from Jody Watley, Jeffrey Daniels, and Howard Hewett, the

20  three (3) individuals comprising Shalamar (the "Shalamar Inducement Letter").  The

21  Shalamar Inducement Letter is signed by Watley, Daniels, and Hewett (in their

22  individual capacity); by Watley as President of Three For Love, Inc.; and by Dick

23  Griffey on behalf of SOLAR.  In the Shalamar Inducement Letter, Watley, Daniels,

24  and Hewett represented to SOLAR that Three For Love, Inc. was entitled to their

25  exclusive services for the recording of phonograph records pursuant to an exclusive

26  recording contract.  Watley, Daniels, and Hewett acknowledged that Three for Love,

27  Inc, was entering into the 1981 Shalamar Agreement pursuant to which Three For

28

-10-

Love, Inc. agreed to convey to SOLAR the masters of any and all recordings that Watley, Daniels, and Hewett made for Three For Love, Inc. under those parties' agreement.  Watley, Daniels, and Hewett confirmed, warranted, and guaranteed that Three For Love, Inc. had the right to enter into the 1981 Shalamar Agreement and to assume all of the obligations, warranties, and undertakings to SOLAR on the part of Three For Love, Inc. therein contained, and that Three For Love, Inc. would continue to have such right during the term of the 1981 Shalamar Agreement and thereafter until all obligations, warranties and undertakings were fully performed and discharged.  Watley, Daniels, and Hewett also confirmed, warranted, and guaranteed that all of the warranties, representations, covenants, and agreements on the part of Three For Love, Inc. contained in the 1981 Shalamar Agreement were true and correct.

40.     Under the 1981 Shalamar Agreement, Three For Love, Inc. agreed to produce for SOLAR Masters embodying the performances of Shalamar.  SOLAR required that the Masters to be delivered be "fully mixed, leadered, sequenced and equalized 15 i.p.s. master tapes in proper form for the production of the parts necessary to manufacture phonograph records therefrom."

41.     The term of the 1981 Shalamar Agreement consisted of an initial term commencing on the date of this Agreement and continuing for three years (3) thereafter, and any extensions of the term as provided in this Agreement.  During the initial term, Three For Love, Inc. agreed to cause Shalamar to record for SOLAR, at a minimum, sufficient Masters to constitute four (4) 12-inch, 33-1/3 rpm long-playing records, each of no fewer than thirty-five (35) and of no more than forty (40) minutes in duration (hereinafter sometimes referred to individually by the term "LP" and collectively by the term "LPs").  Three For Love, Inc. granted SOLAR one (1) option to renew the term of the 1981 Shalamar Agreement for a two (2) year term.  During the renewal term, Three For Love, Inc. agreed to cause Shalamar to

record three (3) LPs.

42.     Under the 1981 Shalamar Agreement, Three For Love, Inc. agreed that each Master would embody Shalamar's performance as the sole featured artist of a single musical composition previously unrecorded by Shalamar, and that each Master would be recorded, in its entirety, at a recording studio or studios.  Three For Love, Inc. further agreed that each LP produced under the 1981 Shalamar Agreement would embody no fewer than eight (8) and no more than ten (10) musical compositions.  The parties agreed that recording sessions for the Masters would be conducted by SOLAR upon such dates and at such locations, as designated by SOLAR, upon reasonable notice to Three For Love, Inc., subject to Shalamar's prior professional commitments.  The parties further agreed that the musical compositions or other selections embodied in the Masters, the individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters, would be designated by SOLAR subject to consultation with Three For Love, Inc.  Three For Love, Inc. agreed that each Master would be subject to SOLAR's approval as commercially and technically satisfactory for the manufacture and sale of phonograph records.  Upon SOLAR's request, Three For Love, Inc. agreed to re-record any musical composition or other selection until a given Master was commercially and technically satisfactory.

43.     So that SOLAR could meet and comply fully with an agreed-upon delivery schedule with its distributor, Three For Love, Inc. agreed to use its best efforts to assist SOLAR in completing the recording and production of each LP required to be delivered by Three For Love, Inc. on certain dates set forth in the 1981 Shalamar Agreement.  SOLAR reserved the right to change the delivery schedule upon advance notice to Three For Love, Inc.

44.     The parties agreed that the recording sessions for the Masters would be conducted under SOLAR's recording license.  The parties further agreed that no

recording sessions would be commenced, nor would any commitments be made or costs incurred, unless and until a proposed recording budget for the Masters to be recorded at such sessions had been approved, in writing, by one of SOLAR's officers.  SOLAR agreed to pay the recording costs of such sessions in accordance with the terms and provisions of the 1981 Shalamar Agreement, in an amount not in excess of the recording budget, and which budget had to be approved in writing by one of its officers.

45.     Three For Love, Inc. agreed to use its best efforts to assure that all union contract forms and report forms for recording sessions, all bills pertaining to such recording sessions, and all necessary payroll forms were submitted to SOLAR within forty-eight (48) hours after each recording session, and in accordance with all applicable union requirements, so that SOLAR would be able to make all payroll payments without penalty for late payment.  SOLAR agreed to make all minimum union scale payments required to be made to Shalamar in connection with the recording services of Shalamar furnished by Three For Love, Inc. under the 1981 Shalamar Agreement.

46.     Three For Love, Inc. agreed that all Masters recorded during the term of the 1981 Shalamar Agreement – and all copyrights in the Masters and all renewals and extensions of those copyrights – would be entirely SOLAR's property, free of any claims, whatsoever, by Three For Love, Inc., Shalamar, or any other person, firm, or corporation.  Three For Love, Inc. agreed that SOLAR would have the sole and exclusive right to copyright the Masters in its name, as the owner and author of the Masters, and to secure any and all renewals and extensions of such copyrights.   Three For Love, Inc. agreed that, in rendering services in connection with the Masters, both it and the members of Shalamar were SOLAR's employees for hire.  Three For Love, Inc. agreed that, upon SOLAR's request, it would execute and deliver to SOLAR assignments of copyright (including renewals and extensions

thereof) in and to the Masters as SOLAR might deem necessary.  Three For Love, Inc. irrevocably appointed SOLAR its attorney-in-fact for the purpose of executing such assignments in Three For Love, Inc.'s name.

47.    The 1981 Shalamar Agreement was exclusive, meaning that Three For Love, Inc. agreed to furnish recordings of Shalamar exclusively to and for SOLAR during the term of the 1981 Shalamar Agreement.  Three For Love, Inc. agreed, upon SOLAR's request, to cause Shalamar to appear on dates and at film studios or other locations designated by SOLAR, upon reasonable notice to Three For Love, Inc., for the filming, taping, or other permanent fixation of audio-visual reproductions of Shalamar's performances.  SOLAR had the right to assign any of its rights, in whole or in part, under the 1981 Shalamar Agreement.

48.    Shalamar recorded five (5) albums under the 1981 Shalamar Agreement: *Go For It* (August 28, 1981); *Friends* (January 29, 1982); *The Look* (July 11, 1983); *Heartbreak* (November 12, 1984); and *Circumstantial Evidence* (June 19, 1987).

**III.    Lakeside.**

49.    Lakeside is a funk band originally from Dayton, Ohio consisting of Fred Alexander, Jr., Norman Beavers, Marvin Craig, Fred Lewis, Tiemeyer McCain, Stephen Shockley, Thomas Shelby, Otis Stokes, and Mark Wood.  During the mid- to late-1970s, Dick Griffey began managing Lakeside.  He signed the group to his record label in 1978.

**A.    The 1978 Lakeside Agreement.**

50.    On or about June 28, 1978, Alexander, Beavers, Craig, Lewis, McCain, Shockley, Shelby, Stokes, and Wood entered into a recording agreement with Dick Griffey d/b/a Solar Records (the "1978 Lakeside Agreement").

51.    Lakeside recorded five (5) albums pursuant to the 1978 Lakeside Agreement: *Shot of Love* (October 17, 1978); *Rough Riders* (September 25, 1979);

1  *Fantastic Voyage* (November 11, 1980); *Keep On Moving Straight Ahead*

2  (November 23, 1981); and *Your Wish is My Command* (November 20, 1981).

3       52.    Unidisc does not possess a copy of the 1978 Lakeside Agreement.

4  Upon information and belief, however, Lakeside and/or its current or former agents

5  possess a copy.

6       **B.    The 1982 Lakeside Agreement.**

7       53.    On October 29, 1982, Oceanfront, Inc. entered into an agreement with

8  SOLAR with respect to the production of Masters of the recording artists

9  professionally known as "Lakeside" (the "1982 Lakeside Agreement").  Oceanfront,

10  Inc. represented that it was a California corporation which was solely and wholly

11  owned by Fred Alexander, Jr., Norman Beavers, Marvin Craig, Fred Lewis,

12  Tiemeyer McCain, Stephen Shockley, Thomas Shelby, Otis Stokes, and Mark Wood

13  professionally known as "Lakeside."  Oceanfront, Inc. warranted, represented, and

14  agreed that it had the exclusive right to Lakeside's recording services under a valid

15  and binding recording contract which granted to it all of the rights necessary for the

16  full performance of its obligations under the 1982 Lakeside Agreement.

17       54.    The 1982 Lakeside Agreement acknowledged that Lakeside currently

18  had a valid exclusive recording agreement with SOLAR, namely the 1978 Lakeside

19  Agreement, but that the parties desired to enter into a new agreement.  Therefore,

20  the term of the 1978 Lakeside Agreement would be deemed to have terminated by

21  mutual agreement of the parties upon  the execution of the 1982 Lakeside

22  Agreement.  Lakeside acknowledged that it was indebted to SOLAR for monies

23  advanced to Lakeside pursuant to the 1978 Lakeside Agreement, and that SOLAR

24  would have the right to recoup such indebtedness from any royalties earned pursuant

25  to the 1982 Lakeside Agreement.

26       55.    Under the 1982 Lakeside Agreement, Oceanfront, Inc. agreed to

27  produce, for SOLAR, Masters embodying the performances of Lakeside.  SOLAR

28

required that the Masters to be delivered be "fully mixed, leadered, sequenced and equalized 15 i.p.s. master tapes in proper form for the production of the parts necessary to manufacture phonograph records therefrom."

56.     The term of the 1982 Lakeside Agreement consisted of an initial term commencing on the date of the 1982 Lakeside Agreement and continuing for ninety (90) days after the delivery to SOLAR of the fourth album to be delivered during the initial term and of the additional renewal term or terms.  During the initial term, Oceanfront, Inc. agreed to produce and deliver to SOLAR, at a minimum, sufficient Masters to constitute four (4) 12-inch, 33-1/3 rpm long-playing records, each of no fewer than thirty-five (35) and of no more than forty (40) minutes in duration (hereinafter sometimes referred to individually by the term "LP" and collectively by the term "LPs").  Oceanfront, Inc. granted SOLAR three (3) options to renew the term of the 1982 Lakeside Agreement for a one (1) year term.  During each renewal term, Oceanfront, Inc. agreed to produce and deliver to SOLAR sufficient Masters to constitute one (1) LP.

57.     Under the 1982 Lakeside Agreement, Oceanfront, Inc. agreed that each Master would embody Lakeside's performance as the sole featured artist of a single musical composition previously unreleased on a recording by Lakeside and that each Master would be recorded in its entirety at a recording studio or studios. Oceanfront, Inc. further agreed that each LP produced under the 1982 Lakeside Agreement would embody no fewer than seven (7) and no more than ten (10) musical compositions.  The parties agreed that the musical compositions or other selections to be embodied in the Masters, the individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters, would be agreed upon mutually by the parties.  The parties further agreed that each Master would be subject to SOLAR's approval as commercially and technically satisfactory for the manufacture and sale of phonograph Records.  Upon

1  SOLAR's request, Oceanfront, Inc. agreed to re-record any musical composition or
2  other selection, until a given Master was commercially and technically satisfactory.
3  The parties agreed that recording sessions for the Masters would be conducted by
4  Oceanfront, Inc., upon such dates and at such locations as designated by mutual
5  agreement between the parties.

6        58.    SOLAR had the right to control the manner and means by which the
7  Lakeside Masters would be recorded.  For instance, the parties agreed that all
8  Masters under the 1982 Lakeside Agreement would be subject to the reasonable
9  approval of Dick Griffey, SOLAR's principal, and that such approval would be
10 either given or withheld in stages corresponding to the progression of completion of
11 the applicable Master.  The parties further agreed that, in the event that Griffey
12 requested Lakeside to make any changes to any Master(s), Lakeside would have the
13 first right and opportunity to make such change(s).  If, after Lakeside had made the
14 requested change(s), the Master was still not satisfactory to Griffey, Griffey had the
15 right to make the changes through a third party producer of his choice.

16       59.    So that SOLAR could meet and fully comply with an agreed-upon
17 delivery schedule with its distributor, Oceanfront, Inc. agreed to complete the
18 recording and production of, and to deliver to SOLAR, each LP required to be
19 produced and delivered by Oceanfront, Inc. under the 1982 Lakeside Agreement,
20 upon certain dates set forth in this Agreement.  SOLAR reserved the right to change
21 the delivery schedule upon advance notice to Oceanfront, Inc.

22       60.    Oceanfront, Inc. agreed that all Masters recorded during the term of the
23 1982 Lakeside Agreement – and all copyrights in the Masters and all renewals and
24 extensions of those copyrights – would be entirely SOLAR's property, free of any
25 claims whatsoever by Oceanfront, Inc., Lakeside, or any other person, firm, or
26 corporation.  Oceanfront, Inc. agreed that SOLAR would have the sole and
27 exclusive right to copyright the Masters in its name, as the owner and author of the

28

Masters, and to secure any and all renewals and extensions of such copyrights. The parties agreed that, in rendering services in connection with the Masters, Oceanfront, Inc. and the individual members of Lakeside were SOLAR's employees for hire. Oceanfront, Inc. agreed that, upon SOLAR's request, it would execute and deliver to SOLAR assignments of copyright (including renewals and extensions of thereof) in and to the Masters as SOLAR might deem necessary. Oceanfront, Inc. irrevocably appointed SOLAR its attorney-in-fact for the purpose of executing such assignments in Oceanfront, Inc.'s name.

61.    The 1982 Lakeside Agreement was exclusive, meaning that Oceanfront, Inc. agreed to furnish recordings of Lakeside exclusively to and for SOLAR during the term of the 1982 Lakeside Agreement. Oceanfront, Inc, agreed, upon SOLAR's request, to cause Lakeside to appear on dates and at film studios or other locations designated by SOLAR upon reasonable notice to Oceanfront, Inc. for the filming, taping or other permanent fixation of audio-visual reproductions of Lakeside's performances. SOLAR had the right to assign any of its rights, in whole or in part, under the 1982 Lakeside Agreement.

62.    Lakeside recorded two (2) albums pursuant to the 1982 Lakeside Agreement: *Untouchables* (April 22, 1983); and *Outrageous* (June 26, 1984).

**IV.    Midnight Star.**

63.    Midnight Star is an electro-funk, soul, and disco band formed in 1976 at Kentucky State University. Midnight Star was signed to SOLAR in or around 1978 after performing at a showcase for SOLAR's founder, Dick Griffey. The individual members of Midnight Star were Bobby Lovelace, William Simmons, Boaz Watson, Melvin Gentry, Belinda Lipscomb, Kenneth Gant, Jeffrey Cooper, Vincent Calloway, and Reginald Calloway.

**A.    The 1980 Midnight Star Agreement.**

64.    Upon information and belief, in or around 1978 Bobby Lovelace,

William Simmons, Boaz Watson, Melvin Gentry, Belinda Lipscomb, Kenneth Gant, Jeffrey Cooper, Vincent Calloway, and Reginald Calloway entered into a recording agreement with SOLAR (the "1978 Midnight Star Agreement").

65.    Upon information and belief, Midnight Star recorded two albums pursuant to the 1978 Midnight Star Agreement: *The Beginning* (March 11, 1980); and *Standing Together* (March 7, 1981).

66.    Unidisc does not possess a copy of the 1978 Midnight Star Agreement. Upon information and belief, however, Midnight Star and/or its current or former agents possess a copy.

**B.    The 1982 Midnight Star Agreement.**

67.    Or or about May 1, 1982, Lovelace, Simmons, Watson, Gentry, Lipscomb, Gant, Cooper, Vincent Calloway, and Reginald Calloway d/b/a MidStar Music, Inc. entered into a recording agreement with SOLAR (the "1982 Midnight Star Agreement").

68.    Midnight Star recorded four (4) albums pursuant to the 1982 Midnight Star Agreement: *Victory* (July 16, 1982); *No Parking on the Dance Floor* (June 10, 1983); *Planetary Invasion* (November 12, 1984); and *Headlines* (May 5, 1986).

69.    Unidisc does not possess a copy of the 1982 Midnight Star Agreement. Upon information and belief, however, Midnight Star and/or its current or former agents possess a copy.

**C.    The 1988 Midnight Star Agreement.**

70.    On February 22, 1988, Midnight Star Productions, Inc. entered into an agreement with SOLAR with respect to the production of Masters of the recording artists professionally known as "Midnight Star" (the "1988 Midnight Star Agreement").  The 1988 Midnight Star Agreement provided that the term of the 1982 Midnight Star Agreement would be deemed to have terminated upon the execution of the 1988 Midnight Star Agreement.

71.    Attached to the 1988 Midnight Star Agreement is an "inducement letter" addressed to SOLAR from William Simmons, Melvin Gentry, Belinda Lipscomb, Jeffrey Cooper, Boaz Watson, Bobby Lovelace, and Kenneth Gant, the seven (7) individuals comprising Midnight Star at the time (the "Midnight Star Inducement Letter").  The Midnight Star Inducement Letter is signed by Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant (in their individual capacity); by Simmons on behalf of Midnight Star Productions, Inc.; and by Dick Griffey on behalf of SOLAR.  In the Midnight Star Inducement Letter, Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant represented to SOLAR that Midnight Star Productions, Inc. was entitled to their exclusive services for the recording of phonograph records pursuant to an exclusive recording contract.  Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant acknowledged that Midnight Star Productions, Inc. was entering into the 1988 Midnight Star Agreement, pursuant to which Midnight Star Productions, Inc. agreed to convey to SOLAR the masters of any and all recordings that Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant made for Midnight Star Productions, Inc., under those parties' agreement.  Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant confirmed, warranted, guaranteed, covenanted, and agreed that Midnight Star Productions, Inc. had the right to enter into the 1988 Midnight Star Agreement, and to assume all of the obligations, warranties, and undertakings to SOLAR on the part of Midnight Star Productions, Inc. therein contained, and that Midnight Star Productions, Inc. would continue to have such right during the term of the 1988 Midnight Star Agreement, and thereafter, until all obligations, warranties and undertakings were fully performed and discharged.  Simmons, Gentry, Lipscomb, Cooper, Watson, Lovelace, and Gant also confirmed, warranted, and guaranteed that all of the warranties, representations, covenants, and agreements on the part of Midnight Star Productions, Inc. contained in the 1988 Midnight Star

1  Agreement were true and correct.

2      72.    Under the 1988 Midnight Star Agreement, Midnight Star Productions,

3  Inc. agreed to produce for SOLAR Masters embodying the performances of

4  Midnight Star.  SOLAR required that the Masters to be delivered be "commercially

5  and technically acceptable fully mixed, leadered, sequenced and equalized 15 i.p.s.

6  master tapes, reference discs and lacquer masters in proper form for the production

7  of the parts necessary to manufacture phonograph records therefrom."

8      73.    The term of the 1988 Midnight Star Agreement consisted of an initial

9  term and of any renewal terms thereafter.  During the initial term, Midnight Star

10  Productions, Inc. agreed to cause Midnight Star to record for SOLAR, at a

11  minimum, sufficient Masters to constitute three (3) 12-inch, 33-1/3 rpm long-

12  playing records, each of no fewer than thirty-five (35) and of no more than forty

13  (40) minutes in duration (hereinafter sometimes referred to individually by the term

14  "LP" and collectively by the term "LPs").  Midnight Star Productions, Inc. granted

15  to SOLAR two (2) options to renew the term of the 1988 Midnight Star Agreement

16  for an additional twenty-four (24) month period.  During each renewal term,

17  Midnight Star Productions, Inc. agreed to cause Midnight Star to record two (2) LPs.

18      74.    During the initial and each renewal term of the 1988 Midnight Star

19  Agreement, Midnight Star agreed to produce and deliver the LP to be recorded

20  thereunder during certain specified times.

21      75.    Under the 1988 Midnight Star Agreement, Midnight Star Productions,

22  Inc. agreed that each Master would embody the performance of Midnight Star of

23  musical compositions previously unrecorded or unreleased within the last five (5)

24  years by Midnight Star, and recorded in its entirety, at a recording studio or studios.

25  Midnight Star Productions, Inc. further agreed that each LP produced under the

26  1988 Midnight Star Agreement would embody no fewer than eight (8) and no more

27  than ten (10) musical compositions.  The parties agreed that recording sessions for

28

the Masters would be conducted by SOLAR upon such dates and at such locations, as designated by SOLAR, upon reasonable notice, to Midnight Star Productions, Inc. and subject to Midnight Star's prior professional commitments.  The parties further agreed that the musical compositions or other selections embodied in the Masters, the individual producer of the Masters, and all other individuals rendering services in connection with the recording of the Masters would be designated by SOLAR subject to consultation with Midnight Star Productions, Inc.  Midnight Star Productions, Inc. agreed that each Master would be subject to SOLAR's approval as commercially and technically satisfactory for the manufacture and sale of phonograph records.  Upon SOLAR's request, Midnight Star Productions, Inc. agreed to re-record any musical composition or other selection until a given Master was commercially and technically satisfactory.

76.    The parties agreed that the recording sessions for the Masters would be conducted under SOLAR's recording license.  The parties further agreed that no recording sessions would be commenced (nor would any commitments be made or costs incurred) unless and until a proposed recording budget for the Masters to be recorded at such sessions had been approved, in writing, by one of SOLAR's officers.  SOLAR agreed to pay the recording costs of such sessions in accordance with the terms and provisions of the 1988 Midnight Star Agreement.

77.    SOLAR agreed to make all minimum union scale payments required to be made to Midnight Star Productions, Inc. in connection with the recording services furnished by Midnight Star Productions, Inc. under the 1988 Midnight Star Agreement.

78.    Midnight Star Productions, Inc. agreed that all Masters recorded during the term of the 1988 Midnight Star Agreement – and all copyrights in the Masters and all renewals and extensions of those copyrights – would be entirely SOLAR's property, free of any claims whatsoever by Midnight Star Productions, Inc.,

Midnight Star, or any other person, firm, or corporation.  Midnight Star Productions, Inc. agreed that SOLAR would have the sole and exclusive right to copyright the Masters in its name, as the owner and author of the Masters, and to secure any and all renewals and extensions of such copyrights.  Midnight Star Productions, Inc. agreed that, in rendering services in connection with the Masters, both it and the members of Midnight Star were SOLAR's employees for hire.

79.     The 1988 Midnight Star Agreement was exclusive, meaning that Midnight Star Productions, Inc. agreed to furnish recordings of Midnight Star exclusively to and for SOLAR during the term of the 1988 Midnight Star Agreement.  Midnight Star Productions, Inc. agreed, upon SOLAR's request, to cause Midnight Star to appear on dates and at film studios or other locations designated by SOLAR, upon reasonable notice to Midnight Star Productions, Inc., for the filming, taping or other permanent fixation of audio-visual reproductions of Midnight Star's performances.  SOLAR had the right to assign any of its rights, in whole or in part, under the 1981 Midnight Star Agreement.

80.     Midnight Star recorded five (5) albums under the 1988 Midnight Star Agreement: *Go For It* (August 28, 1981); *Friends* (January 29, 1982); *The Look* (July 11, 1983); *Heartbreak* (November 12, 1984); and *Circumstantial Evidence* (June 19, 1987).

**V.     Unidisc's Acquisition of the Masters.**

81.     Pursuant to an "Assets Purchase Agreement" dated as of March 1, 2005, Unidisc purchased certain assets from J. Hines Company, Inc. d/b/a Solar Records, previously known as Sound of Los Angeles Records, Inc.  Among those assets purchased by Unidisc were the U.S. rights in each and all of the Masters recorded by Lakeside, Dynasty Shalamar, and Midnight Star described herein, plus all U.S. rights attendant therewith to enable Unidisc to exploit sound recordings derived from these Masters, including, without limitation, the Copyright ownership

1    and all renewal rights therein.

2    **VI.    The Termination Notices.**

3         82.    On November 13, 2013, Lastrada, through its "authorized agent"

4    Laurence S. Moelis, transmitted to Unidisc notice of its "intention to terminate the

5    grant or transfer of copyright and the rights of copyright proprietor" in certain

6    Lakeside Masters owned by Unidisc.  The notice stated its intent to terminate "[a]ll

7    grants or transfers of copyrights…including, without limitation the grants dated on

8    or about June 28, 1978 by and between Oceanfront, Inc. (p/k/a Lakeside) with

9    Sounds [sic] of Los Angeles Records, Inc. ('Solar') and Griffco Management."  The

10   notice specifically purported to terminate Unidisc's Copyright ownership in the

11   Masters embodied on the following Lakeside albums: *Shot of Love* (October 17,

12   1978); *Rough Riders* (September 25, 1979); *Fantastic Voyage* (November 11,

13   1980); *Keep On Moving Straight Ahead* (November 23, 1981); *Your Wish is My*

14   *Command* (November 20, 1981); *Untouchables* (April 22, 1983); and *Outrageous*

15   (June 26, 1984).

16        83.    On December 24, 2013, Lastrada, again through its "authorized agent"

17   Laurence S. Moelis, transmitted to Unidisc notice of its "intention to terminate the

18   grant or transfer of copyright and the rights of copyright proprietor" in certain

19   Dynasty Masters owned by Unidisc.  The notice stated its intent to terminate "[a]ll

20   grants or transfers of copyrights…including, without limitation the grants dated on

21   or about March 3, 1979 by and between William Shelby, Kevin Spencer, Nidra

22   Beard a/k/a Nidra Sylvers, and Linda van Horssen with Sounds [sic] of Los Angeles

23   Records, Inc. ('Solar')."  The notice specifically purported to terminate Unidisc's

24   Copyright ownership in the Masters embodied on the following Dynasty albums:

25   *Your Piece of the Rock* (July 17, 1979); *Adventures in the Land of Music* (June 30,

26   1980); *The Second Adventure* (August 28, 1981); *Right Back at Cha!* (October 22,

27   1982); and *Out of Control* (March 30, 1988).  The effective date of termination was

28

1    listed as January 1, 2016.

2        84.    Also on December 24, 2013, Lastrada, again through Laurence S.

3    Moelis, transmitted to Unidisc notice of its "intention to terminate the grant or

4    transfer of copyright and the rights of copyright proprietor" in certain Shalamar

5    Masters owned by Unidisc.  The notice stated its intent to terminate "[a]ll grants or

6    transfers of copyrights…including, without limitation the grants dated on or about

7    February 2, 1979 by and between Howard Hewett, Jeffrey Daniels and Jody Watley

8    with Sounds [sic] of Los Angeles Records, Inc. ('Solar')."  The notice specifically

9    purported to terminate Unidisc's Copyright ownership in the Masters embodied on

10   the following Shalamar albums: *Disco Gardens* (August 16, 1978); *Big Fun* (August

11   21, 1979); *Three For Love* (December 15, 1980); *Go For It* (August 28, 1981);

12   *Friends* (January 29, 1982); *The Look* (July 11, 1983); *Heartbreak* (November 12,

13   1984); and *Circumstantial Evidence* (June 19, 1987).  The effective date of

14   termination was listed as January 1, 2016.

15       85.    Finally, on December 24, 2013, Lastrada, again through Laurence S.

16   Moelis, transmitted to Unidisc notice of its "intention to terminate the grant or

17   transfer of copyright and the rights of copyright proprietor" in certain Midnight Star

18   Masters owned by Unidisc.  The notice stated its intent to terminate "[a]ll grants or

19   transfers of copyrights…including, without limitation the grants dated on or about

20   1980 by and between Bobby Lovelace, William Simmons, Boaz Watson, Melvin

21   Gentry, Belinda Lipscomb, Kenneth Gant, Jeffrey Cooper, Vincent Calloway, and

22   Reginald Calloway with Sound of Los Angeles Records, Inc. ('Solar')."  The notice

23   specifically purported to terminate Unidisc's Copyright ownership in the Masters

24   embodied on the following Midnight Star albums: *The Beginning* (March 11, 1980);

25   *Standing Together* (March 7, 1981); *Victory* (July 16, 1982); *No Parking on the

26   Dance Floor* (June 10, 1983); *Planetary Invasion* (November 12, 1984); *Headlines*

27   (May 5, 1986); *Midnight Star* (August 24, 1988); and *Work It Out* (May 9, 1990).

28

1  The effective date of termination was listed as January 1, 2016.

2  **VII.  Unidisc's Response and Lastrada's Interference.**

3  86.    In a letter dated December 2, 2015, Unidisc, through counsel, advised

4  Lastrada that its termination notices were ineffective because, among other things,

5  the Dynasty, Shalamar, and Lakeside Masters constituted "works made for hire"

6  and, therefore, were not subject to termination under 17 U.S.C. 203.  Unidisc also

7  advised Lastrada that the termination notices were ineffective because they failed to

8  comply with the relevant statutory requirements.

9  87.    In an email dated December 7, 2015, Lastrada disputed Unidisc's

10 position and asserted that its terminations were, in fact, effective.

11 88.    The parties subsequently engaged in numerous written and verbal

12 communications with respect to Unidisc's ownership of the Dynasty, Shalamar,

13 Lakeside, and Midnight Star Masters.  Lastrada, however, has refused to recognize

14 Unidisc's ownership of these Masters and has acted in contravention of, and without

15 regard for, Unidisc's rights in those Masters.

16 89.    For instance, on or about February 29, 2016, Unidisc was informed that

17 Lastrada had advised Neophonic Music and Media, a company acting on behalf of

18 Twentieth Century Fox Film Corporation, the broadcasters of the March 1, 2016,

19 episode of *American Crime Story* (Episode No. 1WAX05), that Unidisc had lost the

20 U.S. rights in the Lakeside Master entitled "*Fantastic Voyage*", which was to be

21 used in the aforementioned episode of *American Crime Story*.  In a letter dated

22 March 17, 2016, counsel for Unidisc advised Lastrada that this claim was inaccurate

23 and that such a claim constituted wrongful interference with Unidisc's existing and

24 prospective business.

25 90.    Notwithstanding this correspondence, Lastrada continued to make

26 public claims of ownership with respect to the Dynasty, Shalamar, Lakeside, and

27 Midnight Star Masters and to interfere with Unidisc's existing and prospective

28

commercial exploitation of these Masters.  On June 13, 2016, counsel for Unidisc again wrote to Lastrada, advising it that its termination notices were ineffective, and that its public claims of ownership were interfering with Unidisc's business.

91.     Nevertheless, Lastrada continues to claim ownership in and to the Masters, which claims constitute a wrongful interference with Unidisc's rights in the Masters and business relations with respect thereto.

92.     For example, Unidisc is advised that in January, 2017, Stephen Moelis, acting for Lastrada, misrepresented to a third party, who was seeking permission to license the Lakeside Master entitled "Fantastic Voyage," that Lastrada owned exclusively, and to the exclusion of Unidisc, the right to license it.  Moreover, Stephen Moelis represented that other TV production companies had also recognized "Lastrada's U.S. rights" in the Masters.

93.     Also in 2017, representing that it owned 100% of the rights to license the rights to the Shalamar Master entitled "A Night To Remember," Lastrada advised yet another TV production company that it would grant a master use license for its U.S. share of this Master.

94.     Unidisc is further advised that, in or around May 2017, Lastrada misrepresented to a third party, who was seeking permission to license the Shalamar Master entitled "The Second Time Around,"  that Lastrada owned 100% of the U.S. rights in that Master.  These and (upon information and belief) other acts constitute a wrongful interference with Unidisc's rights in the Masters and business relations with respect thereto.

## COUNT I
### (Declaratory Judgment of Copyright Ownership – Works Made For Hire)

95.     The allegations contained in paragraphs 1 through 94 of the Complaint are incorporated herein by reference.

96.     There exists an actual controversy regarding the Copyright ownership

of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.  More specifically, Lastrada (allegedly on behalf of Dynasty, Shalamar, Lakeside, and Midnight Star) asserts that it has terminated Unidisc's Copyright ownership of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.  Unidisc asserts that Lastrada's purported terminations are ineffective because, among other things, the Dynasty, Shalamar, Lakeside, and Midnight Star Masters are "works made for hire" and, therefore, not subject to copyright termination under 17 U.S.C.  § 203.

97.    Under the 1976 Copyright Act, a "work made for hire" is defined as "a work prepared by an employee within the scope of his or her employment" or "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

98.    The Dynasty, Shalamar, Lakeside, and Midnight Star Masters constitute "works made for hire" because they were prepared by employees of SOLAR – specifically the individual members of Dynasty, Shalamar, Lakeside, and Midnight Star (or their furnishing companies) and the staff producers and other personnel of SOLAR – within the scope of those individuals' employment.  The following factors evidence that Dynasty, Shalamar, Lakeside, and Midnight Star were employees of SOLAR: the agreements specifically identify the groups and/or their individual members as employees-for-hire; SOLAR had the right to control the details of the recording of the Masters; Shalamar, Dynasty, Lakeside, and Midnight Star (or their furnishing companies) were generally engaged in the business of recording Masters, while SOLAR was generally engaged in the business of exploiting such Masters; Shalamar's, Dynasty's, Lakeside's, and Midnight Star's

recording of the Masters was done under the direction of SOLAR's principal (Dick Griffey), SOLAR's staff producer(s), and other SOLAR personnel; SOLAR in many cases supplied and paid for the recording studios and other equipment that Shalamar, Dynasty, Lakeside, and Midnight Star used in recording the Masters; Shalamar, Dynasty, Lakeside, and Midnight Star were employed for many years by SOLAR; the parties agreed to a regular compensation and payment structure; and Shalamar's, Dynasty's, Lakeside's, and Midnight Star's recording of the Masters was performed as part of the regular business of SOLAR.

99.   Alternatively, the Dynasty, Shalamar, Lakeside, and Midnight Star Masters constitute "works made for hire" because they are "work[s] specially ordered or commissioned for use as a contribution to a collective work" or "compilation[s]" and the parties expressly agreed in a written instrument signed by them that the Masters would be considered works made for hire.  See 17 U.S.C. § 101.

100.   A record album is a collective work.  A "collective work" is "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."  *Id.*  A record album consists of a number of individual Masters, constituting separate and independent works in themselves, that are assembled into a collective whole.  It also consists of a number of number of separate and independent performances – not only those of the recording artist but also those of the producer, studio musicians, sound engineer, mixer, and others – that constitute separate and independent works in themselves and that are assembled into a whole.

101.   A record album is also a compilation.  A "compilation" is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole

constitutes an original work of authorship. The term 'compilation' includes collective works." *Id.* "An album is a collection of preexisting materials – songs – that are selected and arranged by the author in a way that results in an original work of authorship – the album." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140–41 (2d Cir. 2010).

102.   Pursuant to the foregoing, Unidisc seeks a declaration that it owns all right, title, and interest in and to the Copyrights of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters as "works made for hire."

## COUNT II
### (Declaratory Judgment – Termination Notices Ineffective)

103.   The allegations contained in paragraphs 1 through 102 of the Complaint are incorporated herein by reference.

104.   Even assuming, *arguendo*, that the Copyrights in the Dynasty, Shalamar, Lakeside, and Midnight Star Masters were terminable, Lastrada's termination notices are ineffective.

105.   Under 17 U.S.C. § 203(a)(3), an author may terminate a grant of copyright that covers publication of a work at any time during a five year period beginning "at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier."

106.   In the instant case, Lastrada served termination notices upon Unidisc with respect to the Lakeside Masters on November 13, 2013, and with respect to the Dynasty, Shalamar, and Midnight Star Masters on December 24, 2013.  Each of these termination notices claimed that the effective date of termination for all works was January 1, 2016.  As set forth in the table attached hereto as Exhibit 1, however, the majority of the Masters were not even subject to termination as of the alleged "effective date" listed in Lastrada's termination notices.

107.   Moreover, 17 U.S.C. § 203(a)(4)(A) provides that "a copy of the [termination] notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect."  Unidisc has been unable, however, after exercising due diligence to do so, to locate copies of any termination notices for the Dynasty, Shalamar, Lakeside, and Midnight Star Masters, or other indication that they have been filed with or recorded by the Copyright Office before the effective date of termination listed in Lastrada's termination notices.

108.   In light of the foregoing, Lastrada's termination notices fail to comply with the applicable statutory requirements for termination under 17 U.S.C. § 203, and are ineffective.  Unidisc respectfully seeks a declaratory judgment to that effect.

**COUNT III**
**(Copyright Infringement)**

109.   The allegations contained in paragraphs 1 through 108 of the Complaint are incorporated herein by reference.

110.   Lastrada has infringed Unidisc's Copyrights in the Lakeside Master entitled "*Fantastic Voyage*" by purporting to authorize third parties to exercise Unidisc's exclusive rights therein.  Upon information and belief, Lastrada has similarly infringed Unidisc's Copyrights in other of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.

111.   The Moelis Brothers are individually liable for this infringement as officers and/or owners of Lastrada because there is a substantial and continuing connection between them and Lastrada with respect to the infringing act.  Upon information and belief, the Moelis Brothers participated personally in the foregoing deliberate and willful infringement(s) and used Lastrada as an instrument to carry out this infringement.  Also upon information and belief, the Moelis Brothers are the dominant influences in Lastrada, determined the policies that resulted in the infringement, and derived a financial benefit from the infringement.

112.   Additionally and alternatively, the Moelis Brothers, individually, are vicariously liable for the infringement of Unidisc's exclusive rights and Copyrights in the Lakeside Master entitled "*Fantastic Voyage*" and any and all other Dynasty, Shalamar, Lakeside, and Midnight Star Masters that they have caused to be unlawfully exploited, because they had the right and ability to supervise the infringing conduct and because they had an obvious and direct financial interest in the exploitation of the Copyrights/copyrighted Masters (copyrighted materials).

113.   Additionally, and alternatively, the Moelis Brothers are contributorily liable for the foregoing infringement(s), because they induced, caused, or materially contributed to the infringing conduct with knowledge thereof.

114.   Additionally, and alternatively, the Moelis Brothers, upon information and belief, wrongfully induced third parties to infringe Unidisc's Copyrights in certain of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters, and are, therefore, individually liable for this infringement.

115.   Unidisc has been damaged by Lastrada's and the Moelis Brothers' unlawful infringement and seeks to recover its actual damages and any additional profits of Lastrada and/or the Moelis Brothers with respect to their exploitation of any Dynasty, Shalamar, Lakeside, and Midnight Star Masters.  In the alternative, Unidisc seeks to recover statutory damages and its attorney's fees as set forth in 17 U.S.C. §§ 504, 505.

116.   In addition to damages, Unidisc seeks recovery of its full costs from Lastrada and the Moelis Brothers with respect to this action, including, without limitation, its reasonable attorney's fees.

## COUNT IV
### (Intentional Interference with Business Relations)

117.   The allegations contained in paragraphs 1 through 116  of the Complaint are incorporated herein by reference.

805185.1

118.   Unidisc is a party to existing business relationships with specific third parties, namely licensees of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.  Through its status as publisher or co-publisher of certain of the songs embodied on these Masters, Lastrada would be notified of such licensing opportunities and, therefore, has actual knowledge of these existing business relationships.

119.   Unidisc also has prospective relationships with an identifiable class of third persons, namely potential licensees of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.  Lastrada has knowledge of these prospective relationships.

120.   Lastrada and the Moelis Brothers intended to cause the breach or termination of Unidisc's existing business relationships with licensees of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters and/or interfere with or prevent Unidisc's prospective relationships with potential licensees of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters.

121.   Lastrada and the Moelis Brothers have utilized improper motive or improper means in its attempts to cause the breach or termination of these existing business relationships and/or interfere with or prevent prospective relationships. Specifically, Lastrada and the Moelis Brothers have misrepresented to third parties that Lastrada owns 100% of the U.S. rights in the Dynasty, Shalamar, Lakeside, and Midnight Star Masters and that Unidisc no longer has any rights in those Masters.

122.   Unidisc has suffered damages resulting from Lastrada's and the Moelis Brothers' intentional interference.

WHEREFORE, Unidisc prays for the following relief:

1.     A declaration that Unidisc owns all right, title, and interest in and to the Copyrights of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters as "works made for hire";

2.     A declaration that Lastrada's termination notices were and are

-33-

1  ineffective and, therefore, Unidisc owns all right, title, and interest in and to the

2  Copyrights of the Dynasty, Shalamar, Lakeside, and Midnight Star Masters

3  irrespective of whether they constitute "works made for hire";

4      3.    Permanent injunctive relief preventing the Defendants and their agents

5  from holding themselves out as owning any copyright interest in the sound

6  recordings at issue or interfering with Unidisc's exploitation of its Copyrights.

7      4.    A judgment in favor of Unidisc and against Lastrada and the Moelis

8  Brothers on Unidisc's claim for copyright infringement and an award of actual

9  and/or statutory damages and reasonable costs, including attorney's fees;

10     5.    A judgment in favor of Unidisc and against Lastrada and the Moelis

11 Brothers on Unidisc's claim for intentional interference with business relations and

12 an award of actual, punitive and/or treble damages.

13     6.    Such other and further relief, general or specific, as the Court deems

14 just and proper.

15

16 DATED:  June 8, 2017           BROWNE GEORGE ROSS LLP
17                                      Guy C. Nicholson
                                        Keith J. Wesley
18
19                               SHACKELFORD, BOWEN, MCKINLEY &
                                 NORTON, LLP
20                                      Jay Bowen
                                        John Nefflen
21                                      Will Parsons
22

23                               By: _____/s/ Keith J. Wesley_____
24                                           Keith J. Wesley
                                 Attorneys for Plaintiff Unidisc Music, Inc.
25

26

27

28